IN THE UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JERMAINE LEDAY SR.<br>Plaintiff<br><br>v<br><br>WALMART TEXAS LLC dba WALMART et. al<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil action 4:26-cv-00712 |

**PLAINTIFFS 4TH AMENDED PETITION**

TO THE HONORABLE JUDGE PRESIDING:

Plaintiff Jermaine E. Leday, Sr., proceeding pro se, files this Walmart-only consolidated amended complaint in response to the Court's repleading directive. Plaintiff files under protest and without waiving his Rule 72 objections to Docket 59.

**I. PARTIES, VENUE, PRESERVATION, AND DAMAGES LIMITATION**

1. Plaintiff Jermaine E. Leday, Sr. is an individual residing in Texas and is the owner or person entitled to possess and seek damages concerning the 2018 Lexus LS500, VIN JTHB51FF6J5002740.

2. Defendant Wal-Mart Stores Texas, LLC operates Walmart Store #02066 and its Auto Care/TLE/TMA service operation at 2727 Dunvale Road, Houston, Texas.

3. Venue is proper because the Walmart automotive-service occurrence occurred at Store #02066 in Houston, Harris County, Texas.

4. Plaintiff files this Walmart-only pleading to comply with the Court's directive and does not concede that January 11, 2024 same-Lexus events, related conduct, missing public records, or allocated same-damages issues are unrelated.

5. Plaintiff preserves his objections, appellate rights, Rule 20 position, Rule 21 severance position, Rule 37(e) preservation position, service-related positions, discovery-stay objections, and separately filed motions.

6. At all relevant times, Walmart's automotive-service employees, store managers, assistant managers, customer-care personnel, Asset Protection personnel, Walmart Claims Services personnel, CMI-related claim representatives, and corporate-response personnel acted within the course and scope of Walmart employment or agency.

7. Walmart is liable under respondeat superior for its employees and agents involved in service, claim intake, documentation, investigation, preservation, customer communication, escalation, Asset Protection referral, police-contact referral, delay, denial, repair-path restriction, compensation delay, or refusal to process Plaintiff's claim.

8. Plaintiff asserts Walmart claims for negligence, negligent undertaking, negligent training, supervision, retention and managerial response, bailment-related liability, gross negligence, DTPA violations, defamation per se and false security classification, alternative Insurance Code claim-handling liability, tolling, estoppel, loss of use, consequential damages, and preservation-related evidentiary relief.

9. Plaintiff limits his total requested monetary recovery against Walmart in this Walmart-only pleading to an amount not exceeding $2,500,000.

10. Plaintiff does not plead Walmart's self-insured status as an automatic substitute for insurer status. Plaintiff pleads it because Walmart disclosed self-insured status exceeding the claimed damages, making Walmart's claim-handling, Walmart

Claims Services involvement, CMI involvement, compensation handling, repair-path control, Asset Protection referral, police-contact referral, silence, delay, and refusal to resolve the loss material.

11. Plaintiff pleads Texas Insurance Code Chapters 541 and 542 in the alternative to the extent discovery establishes that Walmart, Walmart Claims Services, CMI, Shane Lunschen, Lisa/CMI, or other Walmart-controlled claim personnel acted as insurers, adjusters, agents, third-party administrators, claim supervisors, or persons engaged in claim adjustment.

12. If Chapters 541 or 542 do not create a direct claim, Plaintiff pleads the same conduct as evidence supporting negligence, negligent undertaking, DTPA failure to disclose, DTPA unconscionability, repair-steering, compensation delay, justifiable reliance, equitable estoppel, tolling, fraudulent concealment, and damages.

**II. FACTUAL BACKGROUND**

13. On January 8, 2024, Plaintiff brought or caused his 2018 Lexus LS500 to be brought to Walmart Store #02066 for battery-related automotive service.

14. Walmart's later claim file identifies Store #2066, 2727 Dunvale Road, Manager Michael Longoria, service date January 8, 2024, work order #25976, and claim type "TLE/TMA Claim due to work/service done by TLE or TMA." Ex. 12.1.

15. Walmart's claim file describes the alleged damage as "electrical," identifies the incident as "Property Damage," lists the vehicle as a 2018 Lexus LS, and states the mileage at service and incident was 71,089. Ex. 12.1.

16. Walmart's claim file states: "The customer says on 1-08-2024 that he towed his car to the auto care center. Technician Ahmed put a battery in the trunk of the car to start it." Ex. 12.1.

17. Walmart's Customer Incident Report identifies Facility #2066, date of incident January 8, 2024, time 9:25 a.m., location ACC-Auto Care, and describes technician Ahmed placing a battery up to the battery in the back/trunk area, touching them together, and the vehicle then failing to work. Ex. 12.2.

18. The same Customer Incident Report states Plaintiff wanted to file a claim and identifies Joshua Garcia as the associate the incident was reported to or another associate in the area. Ex. 12.2.

19. The 2018 Lexus LS500 owner's manual contains vehicle-specific battery and jump-start instructions, including use of the exclusive jump-starting terminal and warnings concerning jumper-cable contact, battery handling, and improper connection. Ex. 2.

20. Plaintiff alleges Walmart, through Ahmed and/or other automotive-service personnel, failed to follow the Lexus battery and jump-start procedures and caused an electrical arc, electrical contact event, or electrical disturbance.

21. Plaintiff alleges dashboard warning lights appeared immediately after Walmart's battery-service work. Ex. 4.

22. Plaintiff later obtained a Car Scanner ELM OBD2 DTC report for VIN JTHB51FF6J5002740 dated December 22, 2025. Ex. 3.

23. The DTC report lists extensive system-specific codes, including 104 DTCs in Engine Control Unit #2, 40 DTCs in Transmission Control Unit #2, confirmed ABS codes, confirmed Adaptive Front Light System code B242E, confirmed Rain Sensor code P1214, and confirmed Telematics code B15A8. Ex. 3.

24. Plaintiff alleges the volume, type, and spread of codes across modules are consistent with his claim that Walmart's battery-service event caused or contributed to widespread electrical-system injury, subject to expert proof and discovery.

25. After the January 8 Walmart battery-service event, the Lexus did not merely display warning lights; it became unreliable and unsafe to operate.

26. Plaintiff alleges the Lexus stopped, shut down, or lost reliable operation several times after the Walmart occurrence, including during February 2024, creating unsafe driving conditions and nearly causing a wreck.

27. Because of those repeated unsafe events, Plaintiff parked the Lexus due to safety concerns rather than continue driving a vehicle he reasonably believed could shut down or malfunction unpredictably.

28. Plaintiff alleges the vehicle's unreliability caused mental distress, anxiety, and loss of confidence because operating a vehicle with intermittent electrical and safety-related failures is materially different from ordinary property-damage inconvenience.

29. Plaintiff promptly attempted to report the damage and obtain remediation from Walmart.

30. Plaintiff alleges Ahmed D. Damja was the service-bay manager or service-bay person in charge on duty when Plaintiff reported the arcing/warning-light event on January 8, 2024.

31. Plaintiff pleads Ahmed's role as material because notice to Ahmed was not merely notice to a subordinate technician; it was notice to the Walmart Auto Care person allegedly managing or controlling the service-bay response.

32. Plaintiff alleges Ahmed and management were informed on January 8, 2024 that Walmart's battery-service conduct caused or contributed to electrical problems with the Lexus.

33. Plaintiff alleges that after the arcing event and warning lights appeared, he contacted Walmart corporate and/or Walmart's 1-800 customer-service process to initiate a claim, report the damage, and request preservation of relevant evidence, including surveillance and internal service records. Ex. 10.

34. When Plaintiff reported the damage, he told Ahmed that Plaintiff was a business owner, that the Lexus was dependable transportation needed for business and contractual relationships, and that damage to the vehicle would affect Plaintiff's ability to work, appear for obligations, pursue contracts, maintain business mobility, and protect existing or expected business relationships.

35. Plaintiff alleges Ahmed responded with hostility, used racially hostile language, and threatened to call Asset Protection or police when Plaintiff attempted to report Walmart-caused damage.

36. Plaintiff alleges Ahmed stated, in substance and as Plaintiff recalls it, “nigga, you will never prove I damaged a damn thing.”

37. Plaintiff alleges the defamatory aspect was not only the racial slur. Plaintiff alleges the threat to call police or Asset Protection falsely implied Plaintiff had committed or was committing some criminal, disorderly, false-report, trespass, fraud, threat, or security-related misconduct when Plaintiff was only reporting damage to his vehicle.

38. Plaintiff alleges no crime had been committed. Plaintiff was not shoplifting, stealing, trespassing, threatening anyone, committing fraud, making a false report, or engaging in disorderly conduct. Plaintiff was reporting an automotive-service damage claim against Walmart.

39. Plaintiff alleges, on information and belief and subject to discovery, that Walmart personnel called, contacted, or caused contact with Asset Protection and/or police on January 8, 2024 concerning Plaintiff’s attempt to report the vehicle damage.

40. Plaintiff does not yet know the exact classification because Walmart has not produced the Asset Protection file, police-contact records, incident classifications, surveillance, or internal communications.

41. Plaintiff alleges any statement, report, classification, or implication that Plaintiff committed a crime, made a false report, acted disorderly, engaged in fraud, threatened anyone, trespassed, stole, or committed security misconduct was false because Plaintiff was a customer reporting property damage arising from Walmart’s own automotive service.

42. Plaintiff alleges Walmart later transferred Ahmed after the incident rather than terminating him. Plaintiff pleads this fact as relevant to Walmart's knowledge, investigation, supervision, retention, credibility, and remedial-response issues, subject to discovery concerning the reason, timing, and documentation for the transfer.

43. Plaintiff alleges Joshua Garcia later made a similar Asset Protection-related threat or statement in a recorded call instead of directing Plaintiff through a clear ordinary claim process. Ex. 8.

44. Plaintiff alleges Walmart's repeated movement from a customer damage complaint to Asset Protection or police-contact channels caused Plaintiff to reasonably believe Walmart was treating him as a security problem rather than as a customer reporting damage from Walmart's own automotive service.

45. Plaintiff alleges this belief was reinforced by Walmart's refusal to identify a clear claim process, refusal or failure to repair or diagnose the vehicle, delayed claim documentation, failure to preserve surveillance, later evidence-collection statements that surveillance was unavailable, and later Walmart/CMI/Walmart Claims Services communications that did not produce a clear claim decision.

46. Plaintiff alleges the Asset Protection threats, suspected police contact, racial slur, and any false security classification are material to notice, motive, management ratification, hostile customer treatment, DTPA unconscionability, defamation per se, negligent training and supervision, preservation, and Plaintiff's justifiable reliance.

47. Plaintiff alleges, on information and belief and subject to discovery, that Walmart and its Asset Protection/loss-prevention structure have been involved in other customer disputes where Walmart personnel, Asset Protection personnel, off-duty officers, or police contact became part of a civil customer dispute, detention, false-arrest claim, false-imprisonment claim, racial-targeting allegation, or alleged wrongful escalation.

48. Plaintiff does not plead those other cases as proof that Walmart acted wrongfully here. Plaintiff pleads them to show that Asset Protection involvement, police-contact records, store-level escalation policies, employee training, incident classifications, and communications with law enforcement are discoverable and material.

49. Plaintiff alleges the material question is whether Walmart employees used or threatened Asset Protection or police contact as a substitute for the ordinary claim process after Plaintiff reported that Walmart's own automotive service damaged his vehicle.

50. Plaintiff alleges Walmart personnel went beyond neutral safety reporting if they threatened Asset Protection, used racially hostile language, discouraged Plaintiff from proving the damage, misclassified a property-damage complaint as a security issue, falsely reported criminal or disorderly conduct, failed to preserve the related file, or used security escalation to avoid repair, investigation, compensation, or documentation.

51. Plaintiff seeks discovery into Walmart's Asset Protection file, police-contact records, incident classifications, employee communications, preservation

history, and policies governing when customer property-damage complaints may be referred to Asset Protection or law enforcement.

52. Plaintiff also alleges that immediately after the arcing/warning-light event, he was in a hurry to report the incident to management inside the store while it was raining.

53. Plaintiff alleges a Walmart employee or subordinate in the Auto Care area waved him through the bay area, causing or permitting Plaintiff to walk through an oily service-bay floor.

54. Plaintiff alleges he slipped on the oily bay floor, which exacerbated preexisting physical conditions and caused additional injury, including a sprained wrist.

55. Plaintiff pleads this fall as part of Walmart's same-day negligent premises and service-bay conduct, not as a separate unrelated event.

56. Plaintiff alleges Walmart's surveillance, service-bay condition evidence, employee identities, incident documentation, preservation practices, and any police or Asset Protection response are material because Walmart controlled the Auto Care bay, the employee who waved Plaintiff through, the floor condition, and any cameras or reports showing the incident.

57. On January 11, 2024, Rohan Jackson called Plaintiff after Plaintiff had contacted Walmart corporate and/or Walmart's customer-service process. Ex. 5.

58. Plaintiff alleges he justifiably relied on Rohan's assurance that the matter would be handled, taken care of, routed, or placed into Walmart's claim process. Ex. 5.

59. Plaintiff further alleges that the Rohan call indicated Michael Longoria or another supervising manager was present in the office with Rohan during the call.

60. Plaintiff alleges the supervising manager present with Rohan ratified, permitted, or failed to correct Rohan's refusal to allow Walmart to touch, repair, diagnose, or reasonably route the vehicle through Walmart's repair or claim process. Ex. 5.

61. Plaintiff alleges the instruction or position that Walmart would not touch the car, after Walmart had already performed the battery service and after Plaintiff had reported arcing and warning lights, placed Plaintiff in an unreasonable position: Walmart controlled the service records, employee information, surveillance, Asset Protection records, police-contact records, claim path, and internal investigation, but refused to provide a meaningful repair, diagnostic, or compensation route.

62. On or about November 20, 2025, Plaintiff submitted a written Walmart grievance titled "Vehicle Damage Claim — Battery Replacement — Store #02066 — Ref #400800017802." Ex. 7.

63. In that written grievance, Plaintiff reported that during the battery replacement a Walmart employee caused an electrical arc, that several dash lights immediately came on after the incident, that Plaintiff immediately reported the condition to a manager on duty in the Auto Care Center, and that Rohan told Plaintiff he would take care of it. Ex. 7.

64. In the same grievance, Plaintiff requested that Walmart open a claim regarding the damage and confirm that all relevant records were preserved, including video, work order, internal notes, and prior calls. Ex. 7.

65. Walmart's later claim file states that the "Date facility notified of loss" was December 17, 2025, even though Plaintiff alleges Walmart had actual notice on January 8, 2024, January 11, 2024, repeatedly thereafter through calls, again through the November 2025 written grievance, and again through December 2025 claim communications. Exs. 5, 7, 10, 12.1, 12.19.

66. Walmart's claim file states that zero photos were taken and leaves blank or unanswered whether damage was inspected when reported. Ex. 12.1.

67. Plaintiff alleges Walmart's failure to photograph, inspect, document, preserve surveillance, disclose employee information, preserve Asset Protection records, preserve police-contact records, or timely process the claim increased the risk of evidentiary loss, impaired Plaintiff's ability to prove what happened in the service bay, and prolonged Plaintiff's loss of use.

68. Walmart's Associate Witness Statement for Joshua Garcia identifies him as Assistant Manager and lists his "Role in Incident" as "firstOnScene, reporter, additionalWitness." Ex. 12.3.

69. Joshua Garcia's statement records that Plaintiff "put in a complaint through a letter to the president," that Joshua called Plaintiff, and that Plaintiff informed him the event occurred on January 8, 2024. Ex. 12.3.

70. Joshua's statement further records Plaintiff's report that technician Ahmed placed a battery in the trunk, touched it together to get the vehicle started, told Plaintiff the vehicle would start but it did not work, and Plaintiff later had to put the vehicle into storage. Ex. 12.3.

71. Joshua's statement also records that he told Plaintiff he could not put in the claim at store level because it had been two years, and that after speaking to a CMI representative named Lisa, she said the claim could be put in at store level and she would investigate. Ex. 12.3.

72. Walmart's own Associate Witness Statement therefore places CMI directly inside the claim process and supports Plaintiff's reliance on the Walmart/CMI internal process. Ex. 12.3.

73. Plaintiff alleges Lisa/CMI's statement that the claim could be placed at store level and investigated reasonably induced Plaintiff to continue pursuing Walmart/CMI's internal process rather than immediately treating Walmart's silence as final denial.

74. On December 19, 2025, Shane Lunschen emailed Plaintiff from a Walmart email address regarding "Claim - 25382402 (Leday, Jermaine)." Ex. 12.19.

75. Shane Lunschen identified himself as contacting Plaintiff "on the behalf of Walmart Claim Services" about Plaintiff's "property damage claim that has been filed." Ex. 12.19.

76. Shane Lunschen stated that, to assist with the "progression" of Plaintiff's claim, Plaintiff should provide information and documentation, including mailing

address, Social Security number if settlement exceeded $5,000, date of birth, owner information, vehicle registration if settlement exceeded $2,500, an ASE-certified mechanic inspection report, and "all evidence to support your claim." Ex. 12.19.

77. Shane Lunschen further stated that the information was "required to prevent identity and insurance fraud," instructed Plaintiff to reply within 15 days, and identified himself as "Case Manager," "General Liability – GK," with Walmart Claims Services, Inc. Ex. 12.19.

78. Plaintiff alleges Ex. 12.19 confirms that Walmart's claim-handling apparatus treated the matter as an **active** filed property-damage claim, requested documentation as part of claim progression, invoked settlement thresholds, invoked insurance-fraud-prevention language, and placed Walmart Claims Services into the claim-handling and compensation process.

79. Plaintiff alleges he provided or attempted to provide the documentation requested by Walmart Claims Services, CMI, Shane Lunschen, and/or Walmart's claim-handling agents.

80. After Plaintiff provided or attempted to provide the requested documentation, Plaintiff alleges Shane Lunschen, Walmart Claims Services, CMI, Walmart, or Walmart's claim-handling agents went silent or failed to issue a clear written decision, recommendation, acceptance, denial, compensation decision, repair decision, or explanation.

81. Plaintiff alleges this post-Joshua and post-Shane course of conduct delayed Plaintiff's ability to obtain a merits determination and contributed to tolling,

equitable estoppel, justifiable reliance, DTPA failure-to-disclose, DTPA unconscionability, negligent undertaking, compensation delay, and mitigation issues.

82. Plaintiff alleges, on information and belief, that the CMI/Walmart Claims Services file likely contains claim notes, recommendations, liability assessments, preservation notes, investigation steps, compensation evaluations, repair-path communications, Asset Protection communications, police-contact communications, or communications concerning Plaintiff's claim.

83. Plaintiff does not plead the content of any unknown CMI or Walmart Claims Services recommendation as established fact. Plaintiff pleads that discovery is necessary to determine whether Lisa, Shane Lunschen, CMI, Walmart Claims Services, Asset Protection, police-contact personnel, or Walmart made a recommendation, why the claim was delayed or denied, and whether Walmart's litigation position conflicts with its claim-handling record.

84. Walmart's First Supplemental Disclosures identify Michael Longoria, Joshua Garcia, Veronica Campbell, David Galvan, Celeste Whitake, Ahmed D. Damja, and Rohan Jackson as persons with discoverable information concerning Walmart policies, procedures, investigation, reporting, and communications with Plaintiff. Ex. 12.7.

85. Walmart also produced an Evidence Collection Sheet dated December 18, 2025. Ex. 12.6.

86. The Evidence Collection Sheet asks whether surveillance video of the incident is available. "No" is marked, and the explanation states only: "The incident happened 1-08-2024." Ex. 12.6.

87. The same Evidence Collection Sheet asks whether physical evidence is available and whether additional documents related to the incident are available. "No" is marked for both. Ex. 12.6.

88. Plaintiff alleges Walmart's Evidence Collection Sheet confirms Walmart treated relevant surveillance, physical evidence, and additional documents as unavailable, but did not provide a meaningful explanation of preservation, retention, deletion, overwrite, or recoverability.

89. The missing surveillance footage was material to more than the physical battery-service event.

90. Footage from the automotive bay would have shown the employee's servicing method, battery connections, employee reaction to the electrical event, warning indicators, supervisors or managers in the area, employee discussions, Plaintiff's route through the bay, the bay floor condition, Plaintiff's fall, and whether Asset Protection or law enforcement was contacted or threatened.

91. Footage from the service counter, Auto Care office, or management area would have shown which managers were present, whether management conferred concerning Plaintiff's complaint, whether Plaintiff's report was escalated, who participated in the response, whether management ratified the "do not touch the car" position, whether Asset Protection or police contact was invoked, and whether management involvement corroborated Plaintiff's recording.

92. Plaintiff alleges that Walmart, Walmart Claims Services, and/or CMI engaged in repair-steering, repair-restriction, repair-path interference, or compensation-delay conduct after the January 8 occurrence.

93. Plaintiff does not use the word "steering" to mean a steering-wheel mechanical problem. Plaintiff uses "steering" in the insurance-claim and motor-vehicle repair sense: requiring, restricting, discouraging, delaying, conditioning, or indirectly limiting a claimant's repair person, repair facility, diagnostic path, parts, products, or compensation route.

94. Texas Insurance Code § 1952.301(b) states that, "In settling a liability claim by a third party against an insured for property damage claimed by the third party, an insurer may not require the third-party claimant to have repairs made by a particular repair person or facility or to use a particular brand, type, kind, age, vendor, supplier, or condition of parts or products."

95. Plaintiff pleads § 1952.301(b) in the alternative and as evidence of the unfairness and materiality of Walmart/Walmart Claims Services/CMI's repair-path and compensation conduct. See Ex 5

96. Plaintiff alleges Walmart cannot use self-insured claim handling, Walmart Claims Services involvement, CMI involvement, store-level refusal, Asset Protection referral, suspected police-contact referral, silence, settlement thresholds, insurance-fraud language, documentation demands, or claim-file control to restrict Plaintiff's repair path, delay compensation, or restrict reasonable diagnosis and repair while simultaneously denying responsibility for the resulting delay.

97. Plaintiff alleges Walmart's repair-path interference, Asset Protection diversion, suspected police-contact diversion, and compensation delay increased loss of use, impaired mitigation, and left Plaintiff without a clear written acceptance, denial, recommendation, compensation decision, or explanation after Walmart Claims Services requested documentation.

98. Plaintiff alleges the Lexus remained impaired, unreliable, unsafe, unavailable, or not reasonably marketable as a result of the January 8 Walmart occurrence and Walmart's subsequent failure to remediate, investigate, disclose, compensate, repair, or fairly process the matter.

99. Plaintiff alleges Walmart's delayed claim handling and failure to preserve evidence worsened the harm because Walmart-controlled records, surveillance, employee identities, service-bay evidence, Asset Protection records, police-contact records, and claim-file materials became unavailable, disputed, or inaccessible while Plaintiff continued seeking internal resolution.

**III. CLAIM ONE — NEGLIGENCE**

100. Plaintiff's negligence claim is based on paragraphs 13 through 34, 52 through 67, and 84 through 99.

101. Walmart owed Plaintiff a duty to exercise ordinary care when accepting and performing battery-related automotive service on Plaintiff's Lexus.

102. Walmart breached that duty by allegedly failing to follow vehicle-specific battery procedures, causing or contributing to an electrical arc or disturbance, failing to return

the Lexus in its pre-service condition, and failing to prevent damage to the vehicle's electrical systems.

103. Walmart also breached ordinary care duties by allegedly permitting or directing Plaintiff to walk through an oily service-bay floor during rain while Plaintiff was attempting to report the service-related incident to management.

104. Walmart further breached its duty by failing to reasonably document, inspect, investigate, preserve evidence, process the claim, disclose material claim information, permit a reasonable repair/diagnostic path, avoid improper Asset Protection or police-contact diversion, issue a clear compensation decision, or mitigate the loss after Plaintiff reported the damage.

105. Walmart's breaches proximately caused damage to the Lexus, loss of use, loss of marketability, expenses, business interruption, inconvenience, compensation delay, mitigation impairment, physical injury from the same-day bay-floor fall if proven, mental anguish where recoverable, and other damages.

**IV. CLAIM TWO — NEGLIGENT UNDERTAKING**

106. Plaintiff's negligent-undertaking claim is based on paragraphs 13 through 34, 57 - 83, and 92 - 99, 103-104.

107. Walmart undertook to provide battery-related automotive service and later undertook to receive Plaintiff's complaint, communicate with Plaintiff, document the incident, open or route a claim, investigate the loss, request supporting documentation, preserve relevant materials, evaluate whether the vehicle could be diagnosed or

repaired, evaluate compensation, and address the reported damage through Walmart's internal process.

108. Walmart's undertaking included Walmart Claims Services, CMI, store-level managers, customer-care personnel, and personnel who controlled whether Plaintiff's vehicle issue would be repaired, diagnosed, escalated, compensated, referred to Asset Protection, referred to police, or treated as a claim.

109. Once Walmart represented that the matter could be handled, put in at store level, investigated, escalated, reviewed, documented, repaired, resolved, compensated, or referred internally, Walmart had a duty to exercise reasonable care in that undertaking.

110. Plaintiff reasonably relied on Walmart's undertaking because Walmart controlled the service bay, employees, managers, claim process, self-insured claim structure, Asset Protection records, police-contact records, Walmart Claims Services routing, CMI claim routing, internal documentation, surveillance, preservation, repair-path decisions, and claim-file information.

111. Walmart failed to exercise reasonable care by allegedly damaging the Lexus, refusing or failing to allow a reasonable diagnostic or repair path, diverting or threatening to divert Plaintiff's complaint to Asset Protection or police-contact channels, delaying inspection and repair, delaying or avoiding compensation, allowing evidence to become unavailable, preventing timely mitigation, prolonging loss of use, and inducing Plaintiff to continue relying on Walmart/Walmart Claims Services/CMI's internal process without a clear decision.

**V. CLAIM THREE — NEGLIGENT TRAINING, SUPERVISION, RETENTION, AND MANAGERIAL RESPONSE**

112. Plaintiff's negligent-training, supervision, retention, and managerial-response claim is based on paragraphs 13 through 51, 52 through 67, 84 - 99; 103-104.

113. Walmart owed Plaintiff a duty to use reasonable care in training and supervising Auto Care employees and managers who perform or supervise battery-related service on modern vehicles with integrated electronic systems.

114. Walmart's duty included training and supervision concerning vehicle-specific battery procedures, proper jump-start terminals, avoiding arcing, recognizing immediate warning lights, stopping work after an electrical event, notifying management, documenting incidents, preserving surveillance, and routing customer property-damage complaints through an ordinary claim process.

115. Walmart's duty also included training and supervision concerning customer movement through the service bay, including not waving a customer through an oily bay floor during rain while the customer was attempting to report urgent service-related damage.

116. Walmart's duty included training and supervision not to respond to a customer property-damage complaint with racial hostility, threats of Asset Protection, threats of police contact, false security classification, intimidation, or statements that the customer would never prove Walmart caused damage.

117. Plaintiff alleges Walmart breached these duties because Ahmed, alleged to be the service-bay manager or person in charge on duty, allegedly used an improper

battery-service method, received notice of arcing and warning lights, responded with racial hostility and a threat to call Asset Protection or police, and Walmart later failed to preserve surveillance, failed to produce a clear claim file, and transferred Ahmed rather than terminating him.

118. Walmart's training, supervision, retention, and managerial-response failures proximately caused or contributed to the vehicle damage, unsafe operation, claim-handling failure, Asset Protection/police-contact diversion, evidentiary loss, same-day fall, justifiable reliance, compensation delay, loss of use, and damages.

**VI. CLAIM FOUR — BAILMENT / FAILURE TO RETURN VEHICLE IN SAME CONDITION**

119. Plaintiff's bailment/failure-to-return claim is based on paragraphs 13 through 24 and 65 through 67.

120. Walmart accepted temporary possession or control of Plaintiff's Lexus for battery-replacement automotive service.

121. Plaintiff delivered the Lexus to Walmart for a limited purpose and expected Walmart to exercise ordinary care while the vehicle was in Walmart's care, custody, or control.

122. Plaintiff alleges the Lexus was returned, released, or left in a materially worse condition after Walmart's service because of an unsolicited jump start service, warning lights and electrical problems appeared immediately after the battery-service event.

123. Walmart failed to return the Lexus in the same condition and is liable for damage and resulting loss caused while the vehicle was in Walmart's care, custody, or control.

**VII. CLAIM FIVE — GROSS NEGLIGENCE**

124. Plaintiff's gross-negligence claim is based on paragraphs 13 through 51, 52 through 67, and 84 – 99 103 -104; 115.

125. Walmart's conduct involved an extreme degree of risk because improper battery handling on a modern luxury vehicle with integrated electrical modules can foreseeably cause serious electrical damage, warning-system failures, unsafe operation, loss of use, loss of value, and cascading system problems.

126. Walmart had actual, subjective awareness of the risk through its automotive-service role, manufacturer procedures, employee training requirements, management structure, same-day notice, claim procedures, Walmart Claims Services process, CMI claim process, and post-incident notice.

127. Walmart proceeded with conscious indifference by allowing improper service, failing to timely remediate, refusing or failing to diagnose and repair the vehicle through a reasonable process, threatening or using Asset Protection or police-contact channels instead of a fair claim process, failing to preserve material evidence, failing to open or route the claim reasonably, failing to disclose CMI/Walmart Claims Services claim status or recommendation, going silent after requesting documentation, delaying compensation, and allowing damages to grow.

128. Plaintiff seeks exemplary damages upon proof of gross negligence by clear and convincing evidence.

**VIII. CLAIM SIX — TEXAS DTPA VIOLATIONS**

129. Plaintiff's DTPA claim is based on paragraphs 13 through 128.

130. Plaintiff is a consumer under the Texas Deceptive Trade Practices–Consumer Protection Act because he sought or acquired Walmart automotive goods or services for consideration.

131. Walmart's battery service, automotive-service transaction, customer-service response, claim-handling response, Walmart Claims Services conduct, CMI claim-routing conduct, Asset Protection referral, suspected police-contact referral, repair-path conduct, compensation handling, and related representations occurred in connection with Plaintiff's *consumer transaction*.

132. Walmart represented, expressly or by implication through its automotive-service offering, work order, employee conduct, and acceptance of the Lexus, that Walmart would provide competent battery-related automotive service. Rohan claimed on 1-11-2024 call that I was in the system, Joshua recorded call claimed he can not open a claim its been 2 years, further he claimed to be first on scene, lastly he claimed preservation was occurring.

133. Plaintiff alleges that those representations were false, misleading, or deceptive because Walmart failed to perform the service in a competent, vehicle-appropriate, and workmanlike manner. Lisa/CMI acknowledged it was not 2 years and claim could be opened, and Joshua was not first on scene I spoke first with Ahmed, Rohan and more than 1 year later Joshua.

134. Walmart failed to disclose material information concerning how the battery service was performed, the electrical arc or improper contact, employee identities and roles, whether damage was inspected, why zero photos were taken, surveillance status,

Asset Protection status, police-contact status, CMI/Walmart Claims Services claim handling, internal recommendations, repair-path decisions, compensation decisions, and the claim process available to Plaintiff.

135. Walmart knew or should have known this information was material because Plaintiff reported arcing, warning lights, unsafe operation, business harm, claim concerns, and preservation concerns on or about January 8, 2024.

136. Plaintiff needed the omitted information to decide whether to continue relying on Walmart's internal process, whether Walmart would diagnose or repair the Lexus, whether Walmart would compensate him, whether Walmart would honor an outside estimate provided February 2024, whether Walmart preserved surveillance, whether Asset Protection or police were involved, and whether Walmart had already decided to deny, delay, or abandon the claim.

137. Walmart employees, managers, customer-care agents, corporate escalation personnel, Walmart Claims Services personnel, and CMI representatives communicated with Plaintiff in a manner creating the impression that Walmart would handle, route, investigate, compensate, repair, or "take care of" the damage claim.

138. Plaintiff alleges that after he provided or attempted to provide requested documentation, Walmart, Walmart Claims Services, Shane Lunschen, CMI, or other claim-handling agents failed to issue a clear written decision, failed to disclose any recommendation or assessment, failed to compensate, and went silent.

139. Walmart's later claim documents were false, misleading, or incomplete because they reflected a facility-notified date of December 17, 2025 despite Plaintiff's alleged

January, & February 2024 notice, repeated calls, and November 2025 written grievance. Exs. 7, 10, 12.1.

140. Walmart's documents also listed zero photos, left damage inspection unanswered, marked surveillance, physical evidence, and additional documents unavailable, and omitted a clear final claim decision, compensation decision, CMI recommendation, Walmart Claims Services recommendation, Asset Protection file, police-contact record, or explanation. Exs. 12.1, 12.3, 12.6, 12.19.

141. Walmart took advantage of Plaintiff's lack of equal knowledge, bargaining power, and access to Walmart's internal systems, surveillance, employee identities, training records, claim records, Walmart Claims Services file, CMI file, Asset Protection file, police-contact file, recommendations, compensation decisions, and preservation systems.

142. Plaintiff alleges Walmart used that disparity to delay, deny, obscure, restrict, intimidate, or avoid responsibility for the damage and resulting loss.

143. Walmart, Walmart Claims Services, and/or CMI restricted, discouraged, delayed, or conditioned Plaintiff's ability to obtain a reasonable diagnostic or repair path after Walmart's January 8 battery-service event allegedly damaged the Lexus.

144. Plaintiff alleges Walmart's conduct violated Texas Business and Commerce Code § 17.46(b)(5), § 17.46(b)(7), § 17.46(b)(12), and § 17.46(b)(24), constituted an unconscionable course of action under § 17.45(5), and breached the implied warranty to perform repair, replacement, or modification services in a good and workmanlike manner.

145. Plaintiff alleges Walmart's DTPA violations were producing causes of damages and were knowing or intentional to the extent Walmart acted after actual awareness of the service event, warning lights, claim notice, preservation issues, Asset Protection threats, suspected police contact, Walmart Claims Services involvement, CMI involvement, repair-path restriction, and compensation delay.

**IX. CLAIM SEVEN — DEFAMATION PER SE / FALSE SECURITY OR POLICE CLASSIFICATION**

146. Plaintiff's defamation-per-se and false-security-classification claim is based on paragraphs 30 through 51, 57 through 61, 67, and 89 through 99.

147. Plaintiff alleges no crime or security offense occurred when he attempted to report Walmart-caused vehicle damage on January 8, 2024.

148. Plaintiff alleges Walmart personnel nevertheless threatened or invoked Asset Protection and, on information and belief, contacted or caused contact with police or security personnel concerning Plaintiff's attempt to report the damage.

149. Plaintiff does not yet know whether Walmart classified the matter as disorderly conduct, false report, fraud, threat, trespass, disturbance, criminal behavior, or another security category because Walmart has not produced the Asset Protection file, police-contact records, incident classifications, internal communications, or surveillance.

150. Plaintiff alleges any statement, report, classification, or implication that Plaintiff committed a crime, made a false report, acted disorderly, engaged in fraud, threatened anyone, trespassed, stole, or committed security misconduct on January 8, 2024 was false because Plaintiff was a customer attempting to report a property-damage claim arising from Walmart's own service.

151. Plaintiff alleges publication occurred, or discovery is needed to confirm publication, because the threat or classification was communicated or routed to Asset Protection, management, corporate personnel, police, Walmart Claims Services, CMI, or another Walmart employee or agent outside the immediate service interaction.

152. Plaintiff alleges the publication was defamatory per se because it falsely imputed criminal, dishonest, threatening, fraudulent, or disreputable conduct and injured Plaintiff in his reputation, business standing, customer status, and ability to obtain fair claim handling.

153. Alternatively, if the Court determines the facts do not support a separate defamation-per-se claim at the pleading stage, Plaintiff pleads the same facts as evidence supporting DTPA unconscionability, negligent supervision, negligent undertaking, mental anguish where recoverable, tolling, estoppel, and discovery into Walmart's Asset Protection/security-routing conduct.

## X. **CLAIM EIGHT — ALTERNATIVE TEXAS INSURANCE CODE CHAPTERS 541 AND 542 / CLAIM-HANDLING CONDUCT**

154. Plaintiff's alternative Insurance Code claim is based on paragraphs 68 through 83 and 92 through 97.

155. Plaintiff pleads this claim in the alternative and without abandoning his primary negligence, DTPA, negligent undertaking, gross-negligence, bailment, repair-steering, compensation-delay, reliance, tolling, and estoppel theories.

156. Plaintiff alleges Walmart Claims Services and CMI acted as claim handlers or adjusters by conduct because they requested documentation for claim progression,

required or requested an ASE-certified mechanic inspection report, referenced settlement thresholds, invoked identity and insurance-fraud-prevention language, controlled the claim file, and controlled whether Plaintiff's claim would be accepted, denied, paid, compromised, delayed, closed, or silently abandoned.

157. Plaintiff alleges Walmart, Walmart Claims Services, CMI, and their claim-handling agents failed to conduct a reasonable investigation, failed to provide a clear written acceptance, denial, explanation, recommendation, payment decision, compensation decision, or reason for silence, and failed to attempt a prompt, fair, and equitable resolution after liability became reasonably clear or after facts required a good-faith investigation and claim decision it is alleged **bad faith conduct** .

158. Plaintiff alleges this conduct violates, or alternatively mirrors and supplies evidence under, Texas Insurance Code Chapter 541's unfair-settlement and unfair-claim-handling standards and Chapter 542's prompt-processing and prompt-payment standards, to the extent discovery establishes Walmart-controlled claim personnel were acting as insurers, adjusters, agents, third-party administrators, claim supervisors, or "***persons"*** engaged in claim adjustment.

159. Alternatively, if Chapters 541 or 542 do not create a direct statutory remedy against Walmart, Plaintiff pleads the same conduct as evidence supporting DTPA, negligent undertaking, unconscionability, repair-steering, compensation delay, justifiable reliance, tolling, equitable estoppel, fraudulent concealment, and damages.

**XI. TOLLING, EQUITABLE ESTOPPEL, FRAUDULENT CONCEALMENT, COMPENSATION DELAY, AND JUSTIFIABLE RELIANCE**

160. Plaintiff's tolling, estoppel, concealment, compensation-delay, and reliance allegations are based on paragraphs 30 through 51, 57 through 83, and 92 through 99.

161. Plaintiff pleads tolling, equitable estoppel, **fraudulent concealment**, compensation delay, and justifiable reliance in the alternative and without conceding that any limitations defense applies.

162. Plaintiff acted diligently by reporting the arcing and warning-light condition to Ahmed and Walmart management on January 8, 2024; contacting Walmart corporate and/or the 1-800 customer-service process to initiate a claim and request preservation; participating in Rohan's January 11, 2024 call; returning to Walmart in February 2024 with a DTPA claim-notice letter and notarized ASE-certified mechanic letter from Hector Vasquez; repeatedly calling Walmart thereafter; submitting the November 2025 written grievance; and providing or attempting to provide requested documentation after Walmart Claims Services contacted him in December 2025. Plaintiff further alleges he possesses a news clipping confirming Hector Vasquez later died, making Walmart's possession or control of the original February 2024 ASE mechanic letter material to notice, preservation, tolling, reliance, and proof. Exs. 5 - 11, 12.19

163. Plaintiff's reliance began on January 8, 2024, when he reported the arcing and warning lights to Walmart personnel and contacted Walmart's corporate/customer-service claim process, and continued after Rohan called on January 11, 2024 and assured Plaintiff the matter would be handled or "taken care of" paraphrased. Ex 5

164. Plaintiff alleges that reliance was justifiable because Walmart controlled the service bay, employees, management response, surveillance, work order, incident

documents, Asset Protection referral, suspected police-contact referral, **claim creation**, corporate/customer-service routing, Walmart Claims Services file, CMI communications, **repair/diagnostic path**, and compensation process.

165. Walmart should not benefit from delay created by its own claim-handling process, silence, **alleged fraudulent nondisclosure,** material claim information, repair-path interference, Asset Protection diversion, suspected police-contact diversion, compensation delay, or conduct that reasonably led Plaintiff to continue pursuing internal resolution.

**XII. CAUSATION AND ALLOCATED DAMAGES**

166. Plaintiff's causation and damages allegations are based on paragraphs 13 - 165.

167. Walmart's conduct was a proximate cause and/or producing cause of Plaintiff's damages.

168. Walmart had actual notice on January 8, 2024 that the Lexus was not merely personal transportation because Plaintiff told Walmart & Ahmed, alleged to be the service-bay manager or person in charge, that Plaintiff was a business owner and that dependable transportation was material to Plaintiff's work, contractual relationships, business mobility, and ability to meet obligations & the vehicle represents his brands reputation and identity.

169. The loss of dependable transportation affected several overlapping economic interests, including Plaintiff's employment relationship with Larry Jenkins Ex. 13.1, work or business relationships involving Michael Reed Ex 13.2, Plaintiff's established City of Port Arthur 14 year vendor history see Ex ORR 25-54 Clifton response, and Plaintiff's

ability to maintain or benefit from a Northwestern Mutual long-term-disability income policy Ex. 13.5.

170. Plaintiff does not plead that Walmart alone caused every employment, long-term-disability, business, or contractual consequence. Plaintiff pleads that Walmart's January 8 vehicle damage, unsafe operation, repair-path interference, claim-handling delay, compensation delay, defamation per se and evidence-preservation failures were substantial contributing causes that overlapped with other later events involving, other third parties.

171. Plaintiff pleads these employment, long-term-disability, business, and contractual **consequences as foreseeable damages** and allocation issues, not as an attempt to recover the same loss twice. Alternatively plead as **tortious interference**.

172. Plaintiff alleges the factfinder may determine what percentage of the loss is attributable to Walmart's conduct as distinguished from medical conditions, employment decisions, insurance decisions, or other contributing events.

173. Plaintiff alleges the Northwestern Mutual disability-income policy provides a contractual baseline for the long-term-disability-related damages theory; Larry Jenkins and Michael Reed provide employment/work baselines; and City of Port Arthur vendor records, including Exs. 13 - 13.5, provide a public-vendor and business-opportunity baseline.

174. Plaintiff seeks actual damages, consequential damages, loss of use, diminution in value, diagnostic and repair-related damages, physical-injury damages where proven, mental-anguish damages where recoverable, reputational damages where recoverable,

employment and long-term-disability damages, business-capacity, DTPA additional damages for knowing or intentional conduct, alternative Insurance Code damages or standards if applicable, exemplary damages upon proof, prejudgment interest, postjudgment interest, costs, and evidentiary or preservation relief.

175. Plaintiff does not seek duplicate recovery for the same injury under different labels, and all damages are sought only to the extent the evidence establishes causation, foreseeability, allocation, mitigation, recoverability, and non-duplication.

XIII. CONDITIONS PRECEDENT, DTPA NOTICE, JURY DEMAND, AND PRAYER

176. All conditions precedent have been performed, have occurred, have been waived, or have been excused.

177. Plaintiff alleges DTPA and claim notice were provided on January 8, 2024, when Plaintiff reported the arcing and warning-light condition to Walmart personnel and contacted Walmart corporate and/or Walmart's customer-service process; again on January 11, 2024 through the Rohan call; repeatedly thereafter through follow-up calls; again through the November 2025 written grievance; and again through December 2025 communications involving Joshua Garcia, Lisa/CMI, Shane Lunschen, Walmart Claims Services, and Walmart's claim process.

178. Plaintiff alleges Walmart cannot avoid DTPA notice by failing to produce or preserve the very call records, intake records, internal notes, surveillance, Asset Protection records, police-contact records, or claim-routing records that would confirm the January 8 and January 11 notice sequence.

179. Alternatively, if the Court determines that additional DTPA notice was required or that notice was deficient, Plaintiff requests abatement rather than dismissal so that any notice issue may be cured.

180. Plaintiff demands trial by jury on all issues so triable.

181. Plaintiff respectfully requests that Walmart be cited to appear and answer and that Plaintiff recover all relief identified in paragraph 174, together with all other relief to which Plaintiff may be justly entitled, with total monetary recovery against Walmart not to exceed $1,000,000.

Respectfully submitted,

Jermaine Leday Sr

JERMAINE E. LEDAY, SR.
Plaintiff, Pro Se
2155 Shirley Street
Port Arthur, Texas 77640
409-433-1234
mow_n_more@yahoo.com

**CERTIFICATE OF SERVICE**

I certify that on September 10, 2026, a true and correct copy of the foregoing was served upon all counsel of record through CM/ECF and by any additional method required.

Jermaine Leday Sr